# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | **Case No. 05-04967-TLM** |
| | ) | |
| **DAVID B. MILLS,** | ) | |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **NETWEST COMMUNICATIONS** | ) | |
| **GROUP, INC., an Idaho** | ) | |
| **Corporation; NETWEST** | ) | |
| **PRODUCTIONS, INC., an Idaho** | ) | |
| **Corporation, and JEFF SCOTT, an** | ) | |
| **Individual,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Adv. No. 06-06012-TLM** |
| | ) | |
| **DAVID B. MILLS,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

David B. Mills ("Mills" or "Defendant") filed a chapter 7 bankruptcy

petition on October 13, 2005.  Netwest Communications Group, Inc.

("Communications") and Netwest Productions, Inc. ("Productions") (collectively

MEMORANDUM OF DECISION - 1

either "Plaintiffs" or the "Corporations") and Jeff Scott ("Scott")[1] filed this

adversary proceeding against Mills objecting to the discharge of certain debts

under § 523(a)(4).[2]  Having carefully considered the evidence presented[3] and the

parties' legal arguments, the following constitute this Court's findings and

conclusions.  Fed. R. Bankr. P. 7052, 9014.

**BACKGROUND AND FACTS**

Mills and Scott were, and currently are, shareholders of Productions and

Communications.  Mills was a director in both corporations, president of

Communications and vice president of Productions.  Scott was a director in both

Corporations, president of Productions and vice president of Communications.

In 2004, a dispute arose regarding the extent of Mills' withdrawal of

corporate funds for personal purposes.  The following year, on June 10, 2005,

---

[1]  Although the caption and pleadings in this adversary proceeding include Scott as a Plaintiff, Plaintiffs' counsel clarified at the commencement of trial that judgment is sought only by Communications and Productions, and that Scott no longer seeks judgment against Mills in any capacity.  A third entity, the SIRS Group, is mentioned in the bankruptcy schedules, and in pleadings in the adversary proceeding, and was referred to at trial.  The SIRS Group was a partnership between Mills and Scott.  It is not a party to this adversary proceeding.

[2]  Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11, U.S. Code.  The amendments to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (2005), do not apply as Mills' petition immediately preceded BAPCPA's effective date.

[3]  All findings based upon or involving testimony incorporate the Court's evaluation of the credibility of the witness involved and the weight to be given the testimony.

MEMORANDUM OF DECISION - 2

Mills resigned as an officer and director of both corporations.[4]  The Corporations

continued to operate with Scott as their sole director and officer.

Several months later, Mills filed a voluntary chapter 7 petition, schedules,

and a statement of financial affairs ("SOFA").[5]  Mills scheduled his ownership of

27.714% of Communications and 50% of Productions.  Doc. No. 1 at schedule B.

He further scheduled outstanding unsecured "loans" owed to both Corporations

for "unknown" amounts.  *Id*. at schedule F.

According to the SOFA, in the several years before the bankruptcy, Mills

had significant gambling income and losses, as well as income from employment

or operation of business.[6]  Mills' regular high stakes gambling in Nevada was

corroborated by all the witness testifying at trial.

On January 23, 2006, Plaintiffs commenced this adversary proceeding to

except from Mills' discharge debts owed to them based on theories of

---

[4]  The statement of financial affairs later filed by Mills indicates that in August 2005, Mills also conveyed his 50% interest in real property (the "Elisa Property") held by the SIRS Group to Scott, for which he received no money.  Doc. No. 1 at response to question 10.

[5]  The Court takes judicial notice of its files in that chapter 7, Case No. 05-04967-TLM. Fed. R. Evid. 201.  Pleadings in the chapter 7 are identified by "Doc. No." and pleadings in this adversary proceeding are identified by "Adv. Doc. No.".

[6]  Mills listed income from employment or operation of business as follows: $41,310.00 from Communications in 2003; $40,409.00 from Communications in 2004; and $33,578.04 from Communications in 2005, through September 1.  Doc. No. 1 at SOFA, response to question 1. For income other than from employment or operation of business, he listed gambling income of $325,446.00 in 2004, "offset by greater losses."  *Id*., response to question 2.  Also, for losses within one year preceding commencement of the case, Mills listed gambling losses of approximately $65,000.00 to the Rio Hotel in September through October of 2004.  *Id*., response to question 8.

MEMORANDUM OF DECISION - 3

embezzlement and larceny.  Adv. Doc. No. 1.  They allege that Mills owes them a combined debt of $322,303.00.  *Id*. at 3.

Trial was held on April 16, 2008.  At the outset of the trial, Plaintiffs' Exhibits 101 (Communications' checks), 102 (SIRS Group's checks[7]), and 103 (Production's checks) were admitted by stipulation.  These Corporations' checks, issued over an almost two year period between January 2003 and November 2004, total $196,056.70 from Communications' account and $90,198.72 from Productions' account, for a combined total of $286,255.42.  *See* Exs. 101, 103.[8]

Plaintiffs then called as witnesses Scott, his wife Stephanie Scott, and employees of the Corporations Jason Hamilton, Greg Standerfer, and Bob Melgard.  Plaintiffs also called Kevin Smith, the Corporations' former account manager at Farmers and Merchants State Bank (the "Bank"), and Debbie Arnstein,

---

[7] Because the SIRS Group is not a party to this adversary proceeding, *see* note 1 *supra*, the checks drawn on that account are not relevant to this decision.

[8] The checks in Exs. 101 and 103 are only selected checks culled from the Corporations' accounts over a significant period, and they clearly do not purport to be exhaustive of the Corporations' financial activity.  All but one of the checks within these two exhibits was signed by Mills on behalf of the Corporations.  (*See* Ex. 101 at check no. 1573, signed by Scott.)  The implicit representation, at least initially, was that the checks gathered and presented in Exs. 101 and 103 reflect the allegedly unauthorized or excessive withdrawals from the Corporations' coffers by Mills.  Why their amount did not equal the $322,303.00 that was expressly referenced in the Complaint as owed the two Corporations was never explained.  Additionally, during argument following close of the evidence, Plaintiffs revised their assertions regarding which of the checks in these two exhibits were indicative of embezzlement and which were to be excluded, as is discussed later in this Decision.

MEMORANDUM OF DECISION - 4

an accountant retained by the Corporations.[9]

During cross-examination of Scott, Plaintiffs' first witness, Defendant offered Ex. 201 (Trustee's final accounting); Exs. 204 through 217 (meeting minutes; Communications' stock ledger; and cancelled stock certificates); and Ex. 219 (bargain and sale deed). These exhibits were admitted without objection.

On the redirect of Scott, Plaintiffs offered Ex. 110 (corporate annual records) and Ex. 111 (Mills' resignation), which were admitted without objection.

During Smith's testimony, Plaintiffs offered Ex. 114. Defendant objected to admission on the basis that the exhibit had not been properly disclosed in accord with pretrial order. Plaintiffs withdrew their offer of this exhibit. None of the other exhibits Plaintiffs had marked (Exs. 104-109, 112-113) were ever offered by Plaintiffs.

When Plaintiffs rested at the close of their case in chief, Defendant also rested, declining to call any witnesses, including Mills.[10]

---

[9]  Arstein was retained by the Corporations in September 2004. It is not entirely clear whether the request was motivated by the size of the accounts and the Bank's perception that the Corporations needed additional accounting expertise, as Smith testified, rather than through concern of Mills' misappropriation as the Scotts suggest.

[10]  Plaintiffs attempted to call Mills to testify in their case in chief. Mills objected on the basis that Plaintiffs failed to disclose him as a witness in violation of the terms of a pretrial order. *See* Adv. Doc. No. 26. When asked to respond to that objection, Plaintiffs' counsel conceded that Mills had not been identified as a Plaintiffs' witness, indicated that they would rely instead on cross-examination of Mills during Defendant's case, and then called another witness. The Court was not required to rule on the objection.

MEMORANDUM OF DECISION - 5

## DISCUSSION AND DISPOSITION

### A.    The Corporations' suit is validly brought

As a threshold matter, Defendant challenges the Corporations' standing or

authority to bring this adversary proceeding.[11]  He argues that, after his June 2005

resignation, Scott was not validly elected as director and president of the

Corporations due to the Corporations' failure to comply with statutory meeting

notice and quorum requirements.  *See* Idaho Code §§ 30-1-705 and 30-1-706.  In

essence, Mills argues that Scott was required to be properly elected as an officer

and director at a duly called shareholders' meeting before he could cause the

Corporations to initiate this adversary proceeding.[12]  Plaintiffs, however, contend

that Scott retained his powers as the sole director and officer and could cause the

Corporations to bring suit.

Every action must be prosecuted in the name of the real party in interest.

---

[11]  An earlier motion for summary judgment raising such issues was denied based on an inadequate and disputed evidentiary record.  *See* Adv. Doc. Nos. 53 (minute entry), 54.  At the hearing on that motion, however, the Court clarified that Plaintiffs' interpretation of the effect of abandonment by the chapter 7 trustee of Mills' stock was in error, and that all stock owned by Mills in both Corporations was abandoned to Mills "*nunc pro tunc* to the date the bankruptcy petition was filed," and not somehow transferred to the Corporations.  *See* Adv. Doc. Nos. 50 (minute entry), 51.

[12]  On July 12, 2005, one month after Mills' resignation, and three months prior to the bankruptcy filing, Scott purportedly held an annual meeting of shareholders of Communications and elected himself director and president.  Ex. 204.  On December 13, 2005, two months after Mills' bankruptcy, Scott purportedly held an annual meeting of shareholders of Productions and reelected himself president.  Ex. 209.  At both meetings, Scott was the only person present.  There was no proof of notice of the meetings.  Though the meeting minutes include a waiver of notice by "all" shareholders, it is unsigned and waiver by the other shareholders was unproven.  Mills contends the meetings and elections were invalid.

Fed. R. Civ. P. 17(a), incorporated by Fed. R. Bankr. P. 7017.  The alleged injuries

were suffered by the Corporations, and they are the real party in interest.[13]

A corporation's capacity to sue or be sued is determined by the law under

which it was organized.  Fed. R. Civ. P. 17(b), incorporated by Fed. R. Bankr. P.

7017.  Unless the articles of incorporation provide otherwise, every corporation

has the power "to sue and to be sued."  Idaho Code § 30-1-302(1).  There was no

evidence in this case as to what the Corporations' bylaws or articles of

incorporation provided.[14]  Thus, because Communications and Productions are

incorporated in Idaho, the provisions of the Idaho Business Corporation Act, Idaho

Code § § 30-1-101 *et seq*., control.[15]

Scott was a director of Productions and Communications at the time the

adversary proceeding was filed.  Though Idaho Code § 30-1-805 generally requires

---

[13] *Accord Chapman v. Pomainville (In re Pomainville)*, 254 B.R. 699, 704-06 (Bankr.
S.D. Ohio 2000) (noting that debtor shareholder's alleged misappropriation of corporate assets
results in injury to the corporation, not to non-debtor shareholder personally).  Scott's contentions
of personal injury, as asserted in the complaint, were abandoned at the commencement of the
trial.  *See* note 1 *supra*.

[14] Scott testified that the Corporations' former counsel "lost" these documents, and he
had made a similar sworn assertion in an earlier summary judgment affidavit.  Scott's testimony
on this score was impeached at trial when he was confronted with correspondence from the
attorney indicating that the corporate documents had never been placed in that attorney's
possession.  Scott admitted that he had received this correspondence before his affidavit was
signed and filed with the Court.

[15] The Court notes in passing that Productions was administratively dissolved on
February 7, 2005, but reinstated in September 2005.  Ex. 110, at G.  Under Idaho law, a
reinstatement "relates back to and takes effect as of the effective date of the administrative
dissolution and the corporation resumes carrying on its business as if the administrative
dissolution had never occurred."  Idaho Code § 30-1-1422.

MEMORANDUM OF DECISION - 7

the annual election of directors, it also states: "Despite the expiration of a
director's term, he continues to serve until his successor is elected and qualifies or
until there is a decrease in the number of directors." Idaho Code § 30-1-805(5).
Thus, regardless of Mills' resignation, or any statutory expiration of Scott's term,
or the allegedly invalid subsequent elections, Scott remained a director of
Productions and Communications by virtue of statute.

Scott was also an elected officer of Productions and Communications prior
to the commencement of this adversary proceeding. Because he neither resigned
nor was removed from office, Scott remained an officer of both Corporations. *See
Weil v. Defenbach*, 208 P. 1025, 1027 (Idaho 1922). Thus, at the time the
Corporations filed the adversary proceeding, Scott was president of Productions.
Further, due to Mills' resignation as president of Communications, Scott, as vice-
president, had the power to act as president of Communications. *See Gemstar Ltd.
v. Ernst & Young*, 917 P.2d 222, 230-31 (Ariz. 1996); *see also* 2A William Meade
Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 627 (2007) (noting
that a vice president may act in the place of an absent president with the "same
authority possessed by [the president]").

Though Scott was therefore a valid director and officer, the question
remains whether he had the ability to cause the Corporations to commence this
lawsuit. The Court concludes he did.

MEMORANDUM OF DECISION - 8

Corporations, of course, act through their officers and directors. The Idaho

Code generally describes the duties of directors and officers, and states:

> All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed by or under the direction of, its board of directors, subject to any limitation set forth in the articles of incorporation.

Idaho Code § 30-1-801(2). An officer has the authority and shall perform:

> [D]uties set forth in the bylaws or, to the extent consistent with the bylaws, the duties prescribed by the board of directors or by direction of an officer authorized by the board of directors to prescribe the duties of other officers.

Idaho Code § 30-1-841.

An officer's "formal authority" expressed in the statute does "not exhaust

the sources of [his] actual or apparent authority." Idaho Code § 30-1-841, ABA

Official Comment. The ABA Official Comment explains:

> Many cases state that specific corporate officers, particularly the chief executive officer, may have *implied authority merely by virtue of their positions.* This authority, which may overlap the express authority granted by the bylaws, generally has been viewed as extending only to ordinary business transactions, though some cases have recognized unusually broad implied authority of the chief executive officer or have created a presumption that corporate officers have broad authority, thereby placing on the corporation the burden of showing lack of authority.

*Id.* (emphasis added). The Idaho Supreme Court has recognized a corporate

president's implied authority. *See Pierson v. Jones*, 625 P.2d 1085, 1087 (Idaho

1981) (absent express prohibition in the corporate bylaws or articles of

MEMORANDUM OF DECISION - 9

incorporation, president had implied authority to borrow money for the

corporation).

Although there is no Idaho case law addressing a president's authority to

cause the corporation to bring suit, several other courts have addressed the issue.

The prevailing authority holds that, absent a prohibition in the bylaws or by the

board of directors, a president of a closely held corporation may initiate a lawsuit

on behalf of a corporation without board of directors' approval.[16]  For example, in

*In re Arcella-Coffman*, 352 B.R. 677 (Bankr. N.D. Ind. 2006), the bankruptcy

court determined the president could initiate a nondischargeability proceeding

under § 523(a) against the debtor – an officer, director and principal of the

corporation – in the corporation's name.  *Id*. at 685.  Not only are the facts *In re

Arcella-Coffman* similar to this case, but the applicable business corporation

statutes are identical to the Idaho statutes.[17]

---

[16]  *See* C.S. Patrinelis, *Power of president of corporation to have litigation instituted by it
where board of directors has failed or refused to grant permission*, 10 A.L.R. 2d 701 (2006)
(citing cases); *see also Rands, LLC v. Young (In re Young)*, 384 B.R. 94 (Bankr. D.N.J. 2008)
(LLC stated a cause of action for nondischargeability of a debt under § 523(a)(4)).

[17]  The debtor in *In re Arcella-Coffman* was one of the plaintiff corporation's two
directors and shareholders.  The corporation's bylaws did not address the filing of litigation, and
the court therefore relied on state statutes.  Like the Idaho Business Corporation Act, the Indiana
Business Corporation Law is based on the ABA's Revised Model Business Corporation Act.  *See
In re Guidant Shareholders Derivative Litigation*, 841 N.E. 2d 571, 572 (Ind. 2006); *Rowland v.
Rowland*, 633 P.2d 599 (Idaho 1981).  The identical code sections referred to here are duties of
officers (Idaho Code § 30-1-841 and Ind. Code § 23-1-36-2) and duties of board of directors
(Idaho Code § 30-1-801(2) and Ind. Code § 23-1-33-1(b)).  Given the closely held corporate
structure, *In re Arcella-Coffman* also noted that the alleged misconduct was "much more
appropriately addressed on the merits, rather than on issues that relate to the formalities of the
(continued...)

MEMORANDUM OF DECISION - 10

Cases permitting a president to cause suit to be commenced by the corporation without board of directors' approval generally reason that such authority is presumed in order to preserve corporate interests. *See Gemstar Ltd.*, 917 P.2d at 230-31 (citing cases); *Kamas Sec. Co. v. Taylor*, 226 P.2d 111 (Utah 1950); *Cicero Ind. Dev. Corp. v. Roberts*, 312 N.Y.S.2d 893, 898 (N.Y. Sup. Ct. 1970); *but see Chun v. Bd. of Trustees of Employees' Retirement Sys. of State of Hawaii*, 952 P.2d 1215, 1228-29 (Haw. 1998) (president may not sue in corporation's name absent a crisis or urgent need to preserve vital corporate interests).[18]

The Court concludes that, absent an express prohibition in the articles of incorporation or bylaws or by documented action of the board of directors, the president of an Idaho closely held corporation is authorized, by virtue of the power granted to him or her by statutory law, to cause the corporation to initiate suit to preserve corporate interests. This conclusion is based on the language of the Idaho

---

[17](...continued)
mechanism by which the corporation's assertion of its interest was sought to be implemented." 352 B.R. at 686, n.7.

[18]   The Court recognizes that there are cases rejecting the idea of presumptive authority, at least in cases where the president attempts to have the corporation bring suit against a shareholder with equivalent control over the corporation. *See*, *e.g.*, *COR Mktg. & Sales, Inc. v. Greyhawk Corp.*, 994 F. Supp. 437, 441 (W.D.N.Y. 1998); *Stone v. Frederick*, 245 A.D.2d 742, 744-45 (N.Y. App. Div. 1997); *L.W. Kent & Co. v. Wolf*, 143 A.D.2d 813 (N.Y. App. Div. 1988); *Tidy-House Paper Corp. of N.Y. v. Adlman*, 168 N.Y.S.2d 448 (N.Y. App. Div. 1957); *see also Ono v. Itoyama*, 884 F. Supp 892, 895-99 (D.N.J. 1995).  Other cases simply hold that a president cannot sue in the corporation's name absent express authority in the bylaws or a resolution of the board of directors.  *See Kaspar v. Thorne*, 755 S.W.2d 151 (Tex. App. 1988).

MEMORANDUM OF DECISION - 11

statutes and corresponding ABA Official Comments, prevailing authority on the issue, and the absence of Idaho law to the contrary.

Given this conclusion, and since Scott remained a director and officer after Mills' resignation from his directorship and office, and notwithstanding a lack of proof of later shareholder meetings and/or elections, the Corporations' commencement of this adversary proceeding was authorized and valid.

However, even though the Court finds that the Corporations could bring this suit, it concludes below that they did not establish a right to relief.

**B.      The debt will not be excepted from discharge under § 523(a)(4)**

**1.      Plaintiffs' burden**

Exceptions to dischargeability of a debt under § 523(a) are strictly construed against plaintiff creditors and liberally in favor of debtors. *Spokane Ry. Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471, 475 n.5, 00.4 I.B.C.R. 199, 200 (Bankr. D. Idaho 2002) (citing *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992)).  Plaintiffs carry the burden of proving each required element of the § 523(a) cause alleged. *Wussler v. Silva (In re Silva)*, 00.2 I.B.C.R. 66, 69 (Bankr. D. Idaho 2000).  The standard of proof for dischargeability exceptions under § 523(a) is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

MEMORANDUM OF DECISION - 12

## 2.      Standards applicable to embezzlement

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  Federal law controls the definitions of embezzlement and larceny under § 523(a)(4).  *See First Delaware Life Ins. Co. v. Wada (In re Wada)*, 210 B.R. 572, 576 (9th Cir. BAP 1997).  Larceny is proven if the debtor has wrongfully and with fraudulent intent taken property from its owner.  *Kiss Enters., Inc. v. Mirth (In re Mirth)*, 99.4 I.B.C.R. 149, 151 (Bankr. D. Idaho 1999).  "Larceny differs from embezzlement in the fact that the original taking of property was unlawful, and without the consent of the injured person."  *Custer v. Dobbs (In re Dobbs)*, 115 B.R. 258, 265 (Bankr. D. Idaho 1990).

In the context of nondischargeability, embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."  *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991) (quoting *Moore v. United States*, 160 U.S. 268, 269 (1885)).  "Embezzlement, thus, requires three elements: (1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than it was entrusted; and, (3) circumstances indicating fraud."  *Id*. (quotations omitted); *Wada*, 210 B.R. at 576 (debtor's fraudulent retention of client's funds in contravention of oral

MEMORANDUM OF DECISION - 13

agreement constituted embezzlement). "'Circumstances indicating fraud' means 'such circumstances that would indicate the presence of fraud or that [the debtor] acted with fraudulent intent.'" *Mirth*, 99.4 I.B.C.R. at 151 (quotation omitted).

Here, the record established that Mills' original access to and control of corporate funds was with Plaintiffs' knowledge and consent. Thus, the Court considers nondischargeability under the theory of embezzlement, not larceny.

**a.      Establishing embezzlement of corporate funds**

Courts have found embezzlement under § 523(a)(4) in the context of officers' or directors' unauthorized withdrawals of corporate funds for personal purposes. For example, where the amount or extent of compensation is established by an agreement, any funds taken in excess of that agreement constitute embezzlement for purposes of § 523(a)(4). *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 633 (Bankr. E.D.Va. 2001) (finding embezzlement where officer withdrew corporate funds in excess of a "definite, non-ambiguous compensation arrangement"); *Ferraro v. Phillips (In re Phillips)*, 185 B.R. 121, 129-30 (Bankr. E.D.N.Y. 1995) (president's withdrawal of corporate funds in excess of agreement constituted embezzlement); *Hall v. Johann (In re Johann)*, 125 B.R. 679, 681-82 (Bankr. M.D. Fla. 1991). Another case, *Farley v. Romano (In re Romano)*, 353 B.R. 738 (Bankr. D. Mass. 2006), explained:

> Where the officer's compensation is established by agreement, any funds taken in excess of that constitute embezzlement for purposes of

MEMORANDUM OF DECISION - 14

11 U.S.C. 523(a)(4).  In contrast, where a debtor was entitled under his employment agreement to pay himself bonuses without restriction as long as the company was profitable, the court found the plaintiff could not show such bonuses were embezzled.  *The focus of analysis in all cases is what the debtor's employment agreement permits with regard to compensation.*

*Id.* at 766 (citations omitted) (emphasis supplied).

Where the plaintiff does not establish a limitation on a debtor's ability to withdraw and retain corporate funds for his own personal uses, a debtor's withdrawals will not be excepted from discharge on the theory of embezzlement. *See In re Wells*, 368 B.R. 506, 515 (Bankr. M.D. La. 2006) (checks that managing member of LLC wrote to himself or to the order of cash were not embezzled where evidence did not support a finding of an agreement barring debtor from paying himself); *Allentown Supply Co. v. McCurdy (In re McCurdy)*, 45 B.R. 728, 731-732 (Bankr. M.D.Pa. 1985) (bonuses were not embezzled where debtor-officer was entitled under his employment agreement to pay himself bonuses as long as the company was profitable); *In re Denson*, 7 B.R. 213, 215 (Bankr. D.Va. 1980) (corporate checks that debtor-employee issued to himself were not embezzled where debtor's fee arrangement was "ambiguous," debtor believed he was entitled to the funds as advances against future earned commissions, and debtor did not conceal the withdrawals).

The foregoing highlights the challenge for corporations alleging embezzlement by an officer, director or shareholder.  Because that person is often

MEMORANDUM OF DECISION - 15

authorized to handle or deal with the corporation's funds or assets, the limits on that authority must be clearly established in order to quantify the extent of any unauthorized use.  This challenge is critical both in establishing that an embezzlement actually occurred, and in establishing the amount of the injury suffered which is claimed to be actionable under § 523(a)(4) – *i.e.*, the amount of the debt the court is asked to declare nondischargeable.

Thus, to establish its § 523(a)(4) case under the corporate-funds embezzlement theory, Plaintiffs must show that Defendant, who was here authorized to access and control the Corporations' funds, was limited in his ability to take or retain such funds for his personal use or to apply them to his own non-corporate purposes, and that Defendant's withdrawals or diversions exceeded the extent or amount of such authorization.

#### b.      Establishing the amount of the embezzlement

The complaint alleges that as of the filing of the petition the Debtor owed the Corporations "the combined sum of $322,303.00 as a result of monies embezzled by the Debtor[.]"  Adv. Doc. No. 1 at 3.[19]  Plaintiffs' prayer is for the Court to enter a judgment "excepting the debts owed to the Plaintiffs from any discharge that may be entered[.]"  *Id.*  In effect, Plaintiffs seek entry of a money judgment together with a declaration that the amount of that judgment is excepted

---

[19]  The $322,303.00 references what was owed only Productions and Communications, and did not include any amounts owed to the SIRS Group or to Scott individually.  *Id.*

MEMORANDUM OF DECISION - 16

from Debtor's discharge.[20]

It was, at one time, questioned whether a bankruptcy court could enter a money judgment in a dischargeability case.  In *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015 (9th Cir. 1997), the debtor argued on appeal that "the bankruptcy court lacks jurisdiction to establish whether a debt on an unliquidated state law claim exists and to enter judgment on that debt." *Id.* at 1017.  The debtor contended that the court should lift the stay, let the state courts liquidate the claim, and then the plaintiff could return to seek a determination of nondischargeability. *Id.*  While the court found that "procedure is certainly an acceptable method to pursue," it was not the sole approach, as reflected by decisions in several other circuits.  *Id.*  The court stated:

> We are particularly persuaded by the analysis of one bankruptcy judge:
>
> > If it is acknowledged as beyond question that a complaint to determine dischargeability of a debt is exclusively within the equitable jurisdiction of the bankruptcy court, then it must follow that the bankruptcy court may also render a money judgment in an amount certain without the assistance of a jury. This is true not merely because equitable jurisdiction attaches to the entire cause of action but more importantly because *it is impossible to separate the determination of dischargeability function from the function of fixing the amount of the non-dischargeable debt.*

---

[20] "Every . . . final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."  Fed. R. Civ. P. 54(c) (2007), incorporated by Fed. R. Bankr. P. 7054.

MEMORANDUM OF DECISION - 17

*In re Devitt*, 126 B.R. 212, 215 (Bankr. D. Md. 1991).

> We conclude, in conformity with all of the circuits which have considered the matter, that the bankruptcy court acted within its jurisdiction in entering a money judgment against Kennedy in conjunction with a finding that the debt was nondischargeable.

108 F.3d at 1017-18 (emphasis supplied).[21]

Given the allegations in this case, the prayer for relief, and the nature of the corporate funds embezzlement theory, it is inescapable that the Court must determine the *amount* of the alleged embezzlement damage as a component of the § 523(a)(4) action.  This Court agrees that, in a case such as this, "It is impossible to separate the determination of dischargeability function from the function of fixing the amount of the nondischargeable debt."  *Id.*

### 3.    The evidence

The Corporations had checking accounts at the Bank, and the Bank was a creditor of both Corporations.  Mills was authorized to issue and sign checks drawn on the Corporations' accounts.[22]  Mills also maintained a personal checking

---

[21]  *Kennedy* was emphatically reaffirmed in *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864 (9th Cir. 2005).  There the court held that a bankruptcy court had the jurisdiction and equitable power to enter a money judgment not just on unliquidated claims but also as a component of determining nondischargeability even if there was a prior, prebankruptcy judgment. *See also Billing Sys., Inc. v. Nee (In re Nee)*, 50 B.R. 268, 272 (Bankr. D. Mass. 1985)  ("If the prior proceeding did not establish the amount of the debtor's larceny, in a subsequent nondischargeability, the creditor must prove and liquidate the amount of the obligation in the nondischargeability litigation.") (citation omitted).

[22]  Plaintiffs' Complaint alleged that Mills "in his capacity as an officer of [the Corporations] had signature authority and withdrawal power over accounts of [the Corporations]."  Adv. Doc. 1 at 2.  Defendant admitted this allegation.  Adv. Doc. No. 22 at 2.

MEMORANDUM OF DECISION - 18

account, and carried a personal line of credit, at the Bank.

### a.    Arnstein's testimony

Arstein testified that through her review of the Corporations' records and financial documents, she found that several corporate checks had been issued payable to the order of the Bank for "large and even" dollar amounts and coded as "travel and entertainment" in the Corporation's internal financial records.[23] Suspecting these checks might not be accurately accounted for, she asked Smith, the Corporation's account officer at the Bank, to determine where the funds were ultimately deposited.  Arnstein testified that, according to Smith, "a number" of such checks, totaling over $200,000.00, had been deposited in Mills' personal account or paid to his personal line of credit at the Bank.

### b.    Smith's testimony

Smith's testimony generally agreed with that of Arnstein.  He explained that the Bank's research department, at his instruction, investigated the "offsets" for the checks Arnstein identified (*e.g.*, a deposit slip; a loan ticket, if the check was applied to a loan; or an "internal bank cash out ticket," if the check was cashed) to determine where the funds were ultimately paid or deposited.  The results of the investigation into the offsets were set out in e-mail correspondence

---

[23]  Not all of the Corporations' checks in Exs. 101 and 103 were made payable to the Bank, nor were all for large and even amounts.  Whether the checks were coded "travel and entertainment" cannot be determined from the exhibits since the checks do not show the Corporations' internal accounting codes.

MEMORANDUM OF DECISION - 19

between Arnstein and Smith. Certain of such e-mails were marked as Exhibit 114 however, as noted earlier in this Decision, Plaintiffs withdrew their offer of this exhibit and it was never admitted into evidence.

When asked to examine check no. 4558 in Ex. 101, Smith testified that a numerical sequence appearing in the "memo" line on the face of the check and again on the reverse of the check was Mills' personal account number.[24] Smith further testified that check no. 4458 was applied to Mills' personal line of credit at the Bank. This conclusion was based upon the review of the offsets (in this case, a loan ticket).

Plaintiffs' counsel commenced a process of asking Smith to identify, check by check, the number on the back of the checks in Ex. 101. Smith testified that several of the checks contained the number previously identified as Mills' account number and, therefore, he believed those checks were either deposited in Mills' personal account or paid to his line of credit at the Bank. Plaintiffs' counsel asked Smith whether it was fair to assume that all checks in the exhibit that were made payable to the Bank and with Mills' account number on the back were deposited in Mills' account or applied to his line of credit. Smith testified that this was a fair assumption, though he "definitely" would want "to see what the offset[s] actually

---

[24] Though Smith didn't have any recollection of this number at the time of trial, he testified that he would have confirmed at the time of the investigation that it was Mills' account number. Smith also clarified that the account number is the same for Mills' personal account and for his line of credit.

MEMORANDUM OF DECISION - 20

[are] to fully confirm" where the checks were deposited.

### c.      Employees' testimony

Testimony was provided from several witnesses regarding prior statements made by Mills. Standerfer and Melgard each testified that in November 2004, Mills told them individually, and in private, that he had "taken" money from the Corporations to gamble. Hamilton testified that in November 2004, Mills admitted to him that he had "stolen" money from the Corporations.[25] Though certain aspects of the recollected conversations seemed a little ambiguous, and it was not always entirely clear just what aspect of his behavior Mills may have been apologizing for, there clearly was a sense of Mills admitting to something.[26]

### d.      Scott's testimony

On direct examination, Scott testified that Mills had told him he had "misappropriated" corporate funds, and that he was sorry. Scott indicated that he subsequently informed Smith at the Bank that there had been misappropriation.

Scott also testified on direct examination that Mills was "not authorized to use [corporate funds] for personal purposes." However, Scott admitted during

---

[25]   Additionally, Scott's wife testified that Mills told her that "he had stolen a check."

[26]   Additionally, Smith testified that Mills admitted to him that he had a gambling problem, and apologized for creating problems for the Bank. Mills' gambling was a recurrent theme in the testimony. The Scotts and each of the corporate employee witnesses socialized with Mills and knew of his gambling activities. Melgard testified that he once saw Mills gamble approximately $25,000.00 in the high limit slot machines in Las Vegas. Scott's wife testified that based on Mills' status as a gambler at the Rio in Las Vegas, the casino regularly "comped" or provided gratis use of its facilities for the Corporations' parties, and even did so for the ceremony and reception when the Scotts married.

MEMORANDUM OF DECISION - 21

cross-examination that Mills was authorized to issue and sign checks on the

Corporations' accounts and, further, that there was a "verbal agreement"

concerning Mills' compensation.[27]  Scott never provided any details regarding this

verbal agreement, and never explained its terms or the extent of this

authorization.[28]

The patent difficulty, therefore, is in identifying which withdrawals or

payments were authorized and legitimate, and which ones were unauthorized.[29]

Because Scott was never asked to describe the verbal compensation agreement or

explain its terms, nothing in this record establishes a cap or any other limitation on

the amounts Mills could draw or retain as compensation for his labors, or for his

services as an officer and director.  Mills was also a shareholder, and there was a

similar lack of detail as to what he might have been authorized or allowed to

receive as distributions in connection with his ownership of the Corporations, if

different from or in addition to other "compensation."  Additionally, Mills also

---

[27]  The inference is that this verbal agreement also governed Scott's compensation or otherwise withdraw or obtain funds, though that aspect of the agreement is not directly relevant to the issues presented.

[28]  Absent any testimony or other evidence regarding the terms of this agreement, the fact that Mills had the authority to issue and sign the Corporations' checks, together with the fact that a verbal agreement existed regarding his compensation, supports the idea that Mills could withdraw funds from the Corporations' accounts as compensation.  Plaintiffs effectively conceded this point when eliminating, from their claimed embezzlement damages, checks Mills issued made payable to himself.  *See* discussion *infra*.

[29]  If allowed to withdraw funds as compensation, the funds could be then used "for personal purposes" contrary to Scott's assertion, and the nature of such use (a deposit to a personal account, a payment on a personal loan or line of credit, or – indeed – gambling) becomes irrelevant.

MEMORANDUM OF DECISION - 22

disclosed in his bankruptcy a "2003-2004 Shareholder - loan from corporation"

owed to both Corporations for an "unknown" amount.  Doc. No. 1 at schedule F.

Shareholder loans in closely-held corporations are neither uncommon nor per se

improper.  There is no evidence here as to whether any such loans were authorized

or their terms and amounts, or whether such loans may have included the amounts

represented by checks made payable to the Bank and deposited to Mills' account

or applied to Mills' line of credit at the Bank.[30]

　　　　　Scott's testimony was not only sketchy on the compensation agreement, it

was attacked by Defendant's counsel in other regards.  It has already been noted

that Scott's testimony and his prior sworn affidavit, to the effect that the

Corporations' former counsel lost the Corporations' documents and records, was

impeached.  *See* note 14 *supra*.  Additionally, Scott's testimony regarding the

Corporations' meeting minutes, both those that he "recreated" and those that he

said were based on his "distinct recollection," were inconsistent with other parts of

the record.[31]  However, this case does not rise or fall on any such tangential

---

　　　[30]  The record lacks other evidence which might be used to fill the gap.  For example,
there were no corporate financial statements or corporate or personal tax returns disclosing
reported amounts of compensation paid, shareholder loans made, or other amounts withdrawn.
There was no evidence presented regarding the Corporations' revenues, or either of the corporate
principals' historical compensation, to provide context or support arguments that the amounts
Mills received were excessive or unauthorized.

　　　[31]  Scott testified that, because the Corporations' original meeting minutes were lost, he
recreated them.  The "recreated" minutes state that they are "based upon the knowledge, belief
and recollection" of Scott.  *See* Exs. 204, 205.  The minutes from Communications' annual
shareholders meeting on July 12, 2005, state that Mills "has filed bankruptcy" and that Mills'
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(continued...)

MEMORANDUM OF DECISION - 23

impeachment.

### 4.      Synthesis of the evidence

The pivotal issue was and remains how much Mills was authorized to

withdraw as compensation for work performed, or distributions of profits as an

owner of the corporation, or in shareholder loans.  This is a critical prerequisite

not just to establishing that an improper and unauthorized withdrawal – an

embezzlement – occurred but also in establishing the amount of that

embezzlement.  The testimony, and the limited number of exhibits admitted into

evidence, do not allow the Court to answer that question.

Plaintiffs would presumably respond that the testimony regarding Mills'

statements to employees or to the Scotts establish that Mills admitted withdrawing

for his own uses some amount of funds in excess of what the Corporations

authorized.  This, Plaintiffs would argue, when considered in conjunction with the

---

[31] (...continued)
shares were held by Lois Murphy, the trustee in the underlying bankruptcy case.  However, Mills
filed bankruptcy on October 13, 2005, three months *after* this July meeting.

Some meeting minutes omit the language, found in others, that they are based upon
Scott's knowledge, belief and recollection.  *See* Exs. 206-210, 212.  According to Scott's
responses to leading questions from Plaintiffs' counsel, he had a "distinct recollection" of these
other meetings supporting the minutes he recreated.  Those meetings include Productions' board
of directors meeting in Jamaica on June 26, 2006.  *See* Ex. 212.  However, notwithstanding
Scott's recollection, the minutes' statement that Melgard was present was contradicted by
Melgard's testimony that he was not present with Scott in Jamaica.

Communications also held a board of directors meeting in Jamaica on June 26, 2006, and
the minutes from that meeting state that "corporate counsel *shall* file a Motion for Abandonment"
of Mills' stock.  Ex. 207 (emphasis supplied).  But the motion to abandon Mills' stock in
Communications waled on June 7, 2006, almost two weeks prior.

MEMORANDUM OF DECISION - 24

evidence of the manner in which at least some of the withdrawals were made,[32]

makes out a prima facie case.

     The problem with this approach, however, is that the amount of the

allegedly improper withdrawals is uncertain.  For the debt to be nondischargeable

under § 523(a)(4), the plaintiff must establish the specific amount of the debt.

*Kennedy*, 108 F.3d at 1017-18; *see also Chapman v. Pomainville (In re*

*Pomainville)*, 254 B.R. 699, 703 at n.1 (Bankr. S.D.Ohio 2000) (corporate funds

misappropriated by debtor-shareholder were not excepted from discharge where

plaintiff "failed to elicit proof of any specific dollar amounts").[33]  In other words,

"the creditor must prove the damages resulting from the embezzlement."  John P.

Ludington, *Bankruptcy: What constitutes embezzlement of funds giving rise to*

*nondischargeable debt under 11 U.S.C.A. § 523(a)(4)*, 99 A.L.R. Fed. 124 § 43

---

[32] Mills made some of the checks in Exs. 101 and 103 payable to the Bank rather than making such checks payable to himself, the latter obviously being a more transparent way of indicating a withdrawal of funds personally from the Corporations.  This arguably supports an inference of an intent to conceal their withdrawal or purpose from Scott's or the Corporations' scrutiny.

[33] *See also In re Fox*, 357 B.R. 770, 778 (Bankr. E.D.Ark. 2006) ("only that portion of [property] inappropriately expended is nondischargeable" under § 523(a)) (citation omitted); *In re Booher*, 284 BR 191, 214 (Bankr. W.D.Pa. 2002) (explaining that "§ 523(a)(4) does not operate to except from discharge debts of a debtor generally on the ground that he or she has embezzled; rather, the plain language of § 523(a)(4) excepts from discharge only "any debt ... for ... [such] embezzlement") (quoting 4 *Collier on Bankruptcy,* ¶ 523.10[2] at 523-77) ("any *debt resulting from embezzlement* ... falls within the exception of clause (4)" of 523(a)) (emphasis in quotation)).  *Accord Sterling Int'l, Inc. v. Thomas (In re Thomas)*, 2003 WL 21981707, *8 at n.25, 03.3 I.B.C.R. 178, 182 at n.25 (Bankr. D. Idaho 2003) (where this Court noted that, to support a money judgment on a § 523(a) nondischargeable debt, a plaintiff must establish the "precise amount" by a preponderance of the evidence).

MEMORANDUM OF DECISION - 25

(2007) (citing *In re Salamone*, 78 B.R. 74 (Bankr. E.D.Pa. 1987)).[34]

 Plaintiffs' quantification of damages was rife with problems.  The Complaint, as noted, alleged a specific amount of $322,303.00 as owed to the Corporations and prayed that such "debts" be excepted from discharge.  *See* note 19 *supra*.  Plaintiffs' case in chief emphasized all the checks shown in Exs. 101 and 103, but those checks totaled $286,255.42 not $322,303.00.  The difference between these amounts was never explained.[35]

 When asked by the Court during closing argument whether all the checks in Exs. 101 and 103 were part of the claimed embezzlement damages, Plaintiffs' counsel admitted that some of these checks represented "legitimate" payments to the Bank.  The legitimate payments were identified as those payable to the Bank but which lack the encoding of Mills' account number on the back of the check.  Plaintiffs' counsel then stated that the embezzlement damages asserted, excluding those legitimate checks, amounted to $229,473.03.[36]

---

[34]  Adequate proof of damages is not a concept unique to nondischargeability litigation. *Accord Cole v. Esquibel*, 182 P.3d 709, 711 (Idaho 2008) (award of economic damages must be based on proof, not speculation or conjecture) (citing *Horner v. Sani-Top, Inc.*, 141 P.3d 1099, 1106 (Idaho 2006)).

[35]  There is a third asserted amount.  In the chapter 7 case, Communications filed a proof of claim for $163,167.36, and Productions filed a $125,698.72 proof of claim.  Together the Corporations' asserted claims total $288,866.08.  Incidentally, Mills' trustee distributed $2,692.58 to Communications and $2,074.27 to Productions on these claims.  *See* Doc. No. 48 (Trustee's supplemental final accounting) at 2.

[36]  The total of these legitimate checks (which includes the check Scott signed, Ex. 101, check no. 1573) is $56,782.39.  Taking the total of Exs. 101 and 103 ($286,255.42), and subtracting the legitimate payments to the Bank ($56,782.39), equals alleged damages of
(continued...)

MEMORANDUM OF DECISION - 26

Plaintiffs' counsel also explained, in response to the Court's continued questioning as to Plaintiffs' position on the specific damage calculations, that this figure of $229,473.03 did not include any checks made payable to Mills personally, and that such overt personal payments were not part of the alleged embezzlement debt.  Contrary to this assertion, however, the alleged damages of $229,473.03 *do* include corporate checks payable to the order of Mills, which total $25,500.00.[37]

By excluding the $25,500.00 in checks payable to Mills from the calculation of embezzlement damages, as Plaintiffs conceded in argument, the alleged embezzlement is further reduced to $203,973.03.

Plaintiffs' counsel ultimately claimed, in closing argument, that the embezzlement consisted only of checks payable to a casino, if any; a cashiers check payable to the Bank and then paid to or cashed at a casino; and the checks that were drawn as payable to the Bank and then deposited in Mills' personal account or applied to his line of credit.  However, Exs. 101 and 103 contain no

---

[36] (...continued)
$229,473.03.  This $229,473.03 is comprised of $163,221.71 in Communications' checks and $66,251.32 in Productions' checks.

[37]  The $25,500.00 is comprised of $17,000.00 of checks drawn on Communications' account and $8,500.00 of checks drawn on Productions' account.  *See* Ex. 101 at check nos. 4367, 4413, 4430, 4492, 4496, 3501, 4559, 4615, and 4674; Ex. 103 at check nos. 1408, 1579, 1608, and 1609.

MEMORANDUM OF DECISION - 27

checks made payable to a casino.[38]  The exhibits do contain a check payable to the Bank and marked on the back with a number identified as that of a cashiers check. *See* Ex. 101 at check no. 4485.  But there is no evidence that this cashiers check, for $15,000.00, was paid to a casino.

It therefore appears that the total of all checks payable to the Bank and deposited into Mills' account or paid toward his line of credit – the remaining category of alleged embezzlement debt or damage – could not exceed $188,973.03.[39]  The Court notes, however, that the numbers on the back of several checks comprising this amount are illegible.  *See* Ex. 101 at check nos. 3773, 4228, 4239, 4668; Ex. 103 at check nos. 1267, 1444.  Because it is not clear whether these six checks, totaling $30,248.99, reflect Mills' account number and were deposited to his account, they should also be excluded in this analysis.  This drops the alleged damage to $158,724.04.

The foregoing discussion illustrates that the claimed embezzlement amount – the corporate funds Mills is alleged to have taken in excess of any "authorized" withdrawals – was protean.  Though first alleged as $322,303.00 in the complaint, the amount was reduced, in fitful stages, to at most $158,724.04 – or over 50% –

---

[38]   The Court's review of the admitted exhibits reveals that the only check made payable to the order of a casino was drawn on the SIRS Group account.  *See* Ex. 102.  As noted earlier, the SIRS Group is not a party to this adversary proceeding.  *See* notes 1, 7 *supra*.

[39]   Total of Exs. 101 and 103 ($286,255.42), less legitimate payments to the Bank ($56,782.39), less checks made payable to Mills personally ($25,500.00), less cashiers check ($15,000.00) equals $188,973.03.

MEMORANDUM OF DECISION - 28

based on Plaintiffs' concessions, explanations, and the evidence.

The Court has considered carefully whether this amount of $158,724.04 should be found nondischargeable.  After parsing the evidence, this amount reflects the checks that were signed by Mills and made payable to the Bank, but deposited into Mills' account or paid toward his line of credit, an approach suggesting concealment or fraudulent circumstances.  There is also the testimony indicating Mills knowingly withdrew corporate funds in excess of any express or implicit authorization.  And there is no doubt that bankruptcy is not a haven for a wrongdoer, and that the benefit of a bankruptcy discharge is only for the "honest but unfortunate" debtor.  *In re Sicroff*, 401 F.3d 1101, 1104 (9th Cir. 2005) (quoting *Grogan*, 498 U.S. at 287).

However, it remains unclear whether this amount of $158,724.04 was in excess of Mills' authorized ability to withdraw and retain corporate funds, because the extent of that ability, and limits on that authorization, were never established. As noted, exceptions to dischargeability are strictly construed, and a plaintiff must prove its case by a preponderance of the evidence.  It cannot rely upon the court to fill evidentiary gaps with supposition.  *See In re Foster*, 2000 WL 33712208, at *5 (Bankr. D. Idaho June 29, 2000); *Huntley v. Vessey (In re Vessey)*, 03.4 I.B.C.R. 227, 229 (Bankr. D. Idaho 2003).  Plaintiffs were instead obligated to prove the actual amount embezzled.  This is requisite to a finding under § 523(a)(4), and to the entry of the necessary money judgment.  *Kennedy*, 103 F.3d at 1017-18.

MEMORANDUM OF DECISION - 29

**CONCLUSION**

Weighing all the evidence, testimonial and documentary, the Court

concludes that Plaintiffs did not carry their burden of proving by a preponderance

of the evidence that Mills owes the Corporations a "debt" in a sufficiently

ascertainable amount, representing corporate funds taken by Mills without

authorization and with the requisite fraudulent intent.

Because the elements required under § 523(a)(4) are not so established,

judgment will be entered for Defendant.

DATED: June 25, 2008

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 30